May it please the court. My name is Joseph Daley for the plaintiffs. With me at counsel's table is Mr. Spencer Burkholz, who litigated the case below. Before I begin, I'd like to ask for five minutes rebuttal time. All right. Try to keep track of it yourself, and I'll try to remind you. I will, Your Honor. This morning I'm going to talk about several items. Several of the defendant's more blatant false and misleading statements, and why this court's decision in the Brody case does not excuse those statements, as well as the sufficiency of the many sources pleaded in the complaint, both human and documentary, showing that the defendant's statements were knowingly false. Before I get into the first set of false statements, though, I want to do a little refresher on exactly what we're talking about here. JNI is a company that made connectivity products between a server and storage area networks. The workhorse of its product line was the old SBUS product, and that SBUS product utilized the Tachyon chip. That's the old product. It's on its way out. The new product that we know, and this is pleaded in the complaint at paragraph 9, the new product that we know JNI had to move to was PCI, and that PCI product was going to depend upon a new type of chip, not the old outmoded Tachyon chip, but the new Emerald chip. On April 11, 2000, CEO Flanagan actually emailed the board and told them that we have to move away from our old SBUS Solaris line. Solaris was the name of the server that used the SBUS product. We have to move to the PCI product so that we can expand and start serving all of the computer manufacturers out there. Coming into October 2000, October is a very heady month for this corporation. They are slated to have a $382 million public offering. Leading up to that public offering, we have a slew of public statements coming from the company. We have an October 16 press release. We have an October 16 conference call with analysts. We have the October 19 prospectus and registration statement itself for the offering, as well as two analyst reports, October 24th and 25th, that specifically refer back to the October 16 conference call. And here's what was being said about the new PCI Emerald product line, the one that they had to move to. This product group is growing. Counsel, let me ask you this. In the Emerald product line, was there more than one product? When you say in the Emerald... Was there more than one item? The Emerald was the chip that was being used to make this new PCI. Emerald could also be used for the old SBUS line. That's why it was a little confusing. When a reference was made to Emerald, it was not clear whether there was the Emerald, new Emerald or old Emerald. And I agree with Your Honor. But you have to also recall that the public statements that were being made to the market, the focus was always on Emerald PCI. But there were other PCI products too, right? There were Tachyon PCI products. Agreed. But let's not forget, Tachyon was the old outmoded chip. That's pleaded in the complaint. Tachyon was being phased out. It was a more expensive chip to produce. The Emerald chip was a newer, improved, faster chip, and yet, conversely, cheaper. So therefore, you have a greater margin. But weren't there products, sun-based products, to which they were going to transfer? If I can phrase this question correctly. They're going from sun-based products to PCI products. They have both a Tachyon PCI product and an Emerald PCI product. That's true. Yeah. But again, as I said, Tachyon. Let me give you just one quick statement. Here's August 2000. Here's the Chairman of the Board, Mr. Wienes, who's one of our named defendants. He is e-mailing the CFO, Gloria Purdy. He says, we are still selling 95% Tachyon after all this time, which is, quote, contrary to plan. So even within the corporation, even within J&I, they knew that Tachyon was on its way out. As I said, the Chairman, the CEO had told the Board back in April, our clients, the OEMs, are demanding that we move to the new PCI products. Well, you can move to PCI with Emerald, and, yes, you can move to PCI with Tachyon. But as I've just shown you, and as the complaint alleges in many more paragraphs, Tachyon was not the vehicle with which they were going to move forward into PCI. It was going to be PCI and PCI Emerald. Now, what was happening in October when those statements were being made? We've got the Vice President of Sales, Mike Orenich, who testified in a separate lawsuit that he warned the executive team of J&I throughout October that they were not going to make the numbers that were being given to the street. He insists that before the numbers were given to the street, he specifically warned the executive team that J&I can't meet its numbers. That's at paragraph 84 of the complaint. I made that very aware to the executive team on a weekly basis so that there was no surprise, contrary to what was given to the street by the company. When did you formulate that projection? Early October. And did you convey that projection to members of the executive team? Yes. Did you convey your projection before the company announced to the street its projected goals for the next quarter? Yes. I'm sorry, but you did give that information about your projection? Yes. Before they made the announcement to the street? Yes. Mr. Orenich was not a lone voice in the wilderness at J&I. At the same time that he was warning the executives, we have a purchasing department employee within J&I whose responsibility it was was to go out and purchase the materials that J&I needed to make its products to sell to its customers. And he specifically recalls, and this is in paragraph 86 of the complaint, he specifically recalls being told at a Tuesday green sheet meeting, that was the name for their Tuesday meetings they held every week, he recalls specifically being told at an October green sheet meeting that new orders were not coming in and that they were slowing demand for their existing products. New orders for what? That's the problem that I have with the allegations. In light of the fact that they have to be highly specific to meet the PSLRA requirement, when you say new orders, I don't know whether it's for PCI, PCI Emerald, Tachyon, PCI Tachyon, I just don't know. This is a very arcane area. I understand, Judge Rawlinson. And let's not forget, though, some of the false statements being made to the street weren't necessarily about a specific product. Rather, they were a little more global about what was happening inside the company. So when you say that we are experiencing greater demand for our products, when you say that we as the company are very comfortable with what you, the analysts, are saying we are going to do in the next quarter, I would submit that a purchasing department employee who is told that demand is not growing and that we are not getting the new orders and that you better go out and cancel some of your orders for materials used to make our orders. So you say that's global. You say that allegation is about the global state of the company. Yes. And not about any particular product line. But we also have, and I will continue with, as you said, I mean, it's an arcane area. And to tell you the truth, this complaint is chock full of warnings coming in through the executive suites about what's going on, what's going wrong with the products. That's the problem we're having. I don't know if we are to analyze this as a global statement regarding the company or whether or not it was regarding the anticipated public offering, which was not global. It was just for a specific product. Well, let me give you a few more of the statements coming in in October, and then I'm going to jump to another set of false statements made in November. October 12th, the chairman emailing, again, three of our defendants. Here's a very specific product. Hitachi will not purchase any more PCI cards from J&I. Should we amend the prospectus? Should we tell the people that are going to buy $382 million worth of our stock that one of our major customers. Is that PCI or PCI Emerald, though? It just says PCI. That's the problem. I understand that. August 23rd, this is CFO Purdy speaking to Gregory and McNett. EMC, recall, EMC is J&I's main customer. EMC buys two-thirds to three-quarters of all the product, and I can safely say all the product, that J&I makes. August 23rd, EMC has stopped testing Emerald, that is, stopped testing the Emerald chip. They've almost thrown us out. And then, of course, we have budget, hard budget numbers from July, August, and September of 2000, showing the insiders that Emerald revenue, and I would submit that probably means Emerald overall, Emerald SBUS as well as Emerald PCI, Emerald revenue is 65% below budget. They had budgeted $5.7 million, and they had only sold $2 million. Now, moving forward to November. November, the market starts to get wind of the problems with the old workhorse. They suspect that J&I is not selling as much of SBUS as they've been telling the market. So the CFO talks to the Dow Jones Business Weekly, and she says, no, no, no. We've got, quote, continued growth in our SBUS line. On November 13th, a prepared statement from the company, quote, From all indications in the market, from Sun, our major original equipment manufacturers, and our key customers, now let's not forget the key customers, EMC, SBUS is strong and growing. Nothing has changed. But we know, because we've alleged the contents of the document at paragraph 85A, right around the same time, in a comment from the CEO, from that very same gentleman that just said SBUS is strong and growing, SBUS shipments have just decreased 36% from September to October, again reflecting a slowdown in orders from EMC. Now, that's a very pregnant statement there. There's a decrease in SBUS orders, which is directly contradictory to what he just told the market. It again reflects a slowdown from their largest customer. This is not the first time it's happened. It is again slowing down. And then November 7th, right around the same time, the CFO emailing another executive within the company, we are not selling PCI. On the same day, she sends off another frantic email to the head of human resources, Hugo Santos, we're missing the quarter. This is directly contrary to what was just being told to the market on November 11th and November 13th. And let's not also forget what's happening in November. We've got Mike Orenich again testifying that he met with CFO, with Chief Financial Officer Purdy and the Vice President of Finance, Paul Kim, and Purdy specifically requests that he go out and beat the bushes among their Asian customers, China, Korea, Taiwan, Hong Kong, find some of these people and get them to buy some more of our Emerald product. I'm paraphrasing here, but it's in the complaint at paragraph 114. He says, I can't do that. They don't have the funds to buy our product. They don't have the credit lines to give it to them on credit. And she says, I don't care. Create phony purchase orders, get it over there, and he refuses. Let me ask you something. In the complaint, you know, people were described as former top executives, other former employees, sales team. Why weren't there specific names put in in the complaint as required under the Act? Your Honor, I'm not so sure we need specific names. I'm not so sure the PSLA requires that. At the time this complaint was drafted, this Court's decision in the Dow case had not yet come out, and I believe it was in Dow that this Court adopted the Second Circuit's standard from the Novak case, basically saying if you're going to rely upon human sources, you need to give us some indication that would at least support the probability that persons in that position would possess the information, not support the certainty, all right, just the probability. And I think by describing, for example, a purchasing department employee whose responsibility it is to buy the raw materials with which to make the chips and the PCI, the peripheral component interconnects, I think that's enough. Does it help matters really to say that it was Fred Smith in purchasing? I think it's enough to say that, and I don't think this Court's decision in Dow requires any more. And when we were able to give the name of an employee, we certainly did. I mean, this complaint is just littered with names of J&I insiders who either have spoken to our investigators or who gave testimony in unrelated state lawsuits. We've got Mike Ornitz, the Senior Vice President of Sales. We've got Scott Ruppel, Vice President of Marketing and Business Development, who is continually emailing the members of the executive team saying, guys, we're not making things, we're not cutting things here. Let me just give you a few of those emails. You're down to six minutes. I have one minute left. So I guess I'll just briefly segue to our documentary sources. As I said, the complaint is chock full of emails. And with those emails and with the internal reports that we were able to describe with particularity, we've met the Silicon Graphics standard. Particularly with the emails, we've given the Court name of the author, name or names of the recipients, the date it was sent, the contents of the emails. Those particular documents more than meet SGI, which, again, said if you're going to rely upon some sort of some of the specifics. As we know, the SGI Court's concern was whether or not the internal reports that were generically described there even existed. And I think there's no doubt that these emails exist. I see I am coming on to my time for rebuttal, so I'll sit down for a while. May it please the Court. My name is Robert Brownlee for the Defendants and Appellees J&I Corporation. Terry Flanagan, Gloria Purdy, Tom Gregory, Chuck McNeck, Eric Guinness, and John Stitzka. Many securities class action cases involved alleged misforecasts. Your Honors, this is the case of the missing forecast. Today, I would like to address several issues, beginning with the missing forecast from the complaint, then to talk about the branch versus tunnel incorporation doctrine, to talk about the impact of the recent U.S. Supreme Court decision in Dura on this case, to talk about the fact that the District Court correctly concluded that Falsity and Sienta were not alleged in this complaint, to go over the fact that the totality of the allegations in this complaint is completely inconsistent with the plaintiff's theory of fraud, and therefore, the totality shows that Sienta wasn't pled, and that finally, the leave to amend was properly denied. Here, the plaintiff's theory of the case is, with incredible prescience, in April 2000, Gloria Purdy, Terry Flanagan, some members of the board, and other senior executives of J&I, knew in four quarters, in the fourth quarter, more than a half a year down the road, that the company's revenue growth would plateau, and that because of that, they orchestrated a complex securities fraud scheme in order to launch an initial public, or a secondary public offering with all the attendant due diligence while they're conducting the scheme to commit fraud, and dump their stock, and then for some unexplained reason, continue this alleged fraud until the company makes a voluntary forecast in the fourth quarter. J&I, at this period of time, in 2000-2001, was a unique high technology company. It had actual products that were being sold, it was generating actual revenues, and had actual profits. And this company, over the class period, and in the points of time alleged in the complaint, had record, undisputed revenue growth and earning growth, quarter over quarter, year over year. And it is in this context where the company is having record growth in the second quarter of 2000, record growth in the third quarter of 2001, now we're into the class period, these numbers are undisputed, they launched their secondary offering, and then in the fourth quarter of 2001, on December 11th, the company makes its first forecast to the market, and the company's stock falls. This case was filed on the heels of the last corrective disclosure on March 28, 2001. A motion to dismiss was filed, the plaintiffs amended in response. There were three other motions to dismiss. The court carefully considered, in very detailed decisions, why the case did not plead a valid claim. The court specifically told plaintiffs what they had to do to correct their complaint, and the plaintiffs failed to do that. Can I just dialogue with you about that? Yes. And I want to make sure I understand what happened. There were several complaints filed initially by different plaintiffs, correct? And by different plaintiffs, sometimes same firm, sometimes different firm. And then there's a first amended consolidated complaint, or there's a first consolidated complaint that is subsequent to that? Correct, Your Honor. And there's no direction given by the district court between the initial complaints and the consolidated complaint as to the content? Not at that point, Your Honor. All right. There's a motion to dismiss the first consolidated complaint, which is granted with leave, and the order granting leave gives specific directions to the plaintiffs, the lead plaintiffs, as to what needs to be alleged, correct? Correct, Your Honor. All right. Then there's a second amended complaint, second amended consolidated complaint, which is again dismissed by the district court, again with directions and leave to amend, correct? Correct. And then the third amended consolidated complaint, which is the operative complaint today, is dismissed without leave. So there are two prior opportunities before the dismissal without leave to amend in response to directions given by the district court, correct? Correct, Your Honor. All right. Thank you. I'll come back to this with the plaintiff, but I just wanted to get the procedural history clear. Right. And then as the case comes to this court, if you read the briefs, you could reasonably come away with the impression that the plaintiff's argument is that the district court completely botched it every single time. But if you go into the footnotes of the briefs, they don't even believe that because they don't challenge the dismissal as to three of the press releases they alleged to be false, to all of the statements made during the roadshow for the secondary offering. They don't appeal the district court's decision that the accounting fraud allegations weren't adequately pled, and they don't challenge the district court's decisions with respect to the CEO's retirement plan. So the court didn't botch the decision below, and we submit the entire ruling was correct. Now let me please turn to the missing forecast, and that's the linchpin allegation of this case. It's mentioned no less than 14 times in the third amended complaint. It's mentioned six times in their opening brief. It's mentioned two times in the reply, and you heard it referred to this morning. The problem is, there is no forecast alleged in the complaint that J&I gave to the market for the fourth quarter of 2000 until December 11, 2001, when the company made a forecast that disappointed the market, that caused the stock price to decline. The key point in time here is October 16, 2000, and that's when the company announced its third quarter earnings, which contained only historic information, and they held a conference call with the securities market. In that conference call, the plaintiffs allege that Gloria Purdy, the CFO of the company, told the analysts and the participants in the call that she was comfortable with the analyst's forecast. They quote the conference call, and then they go on and add in the complaint, which came up the first time in the second amended complaint. So it was addressed in two separate orders by the district court, that the forecast at that time was for 18 to 20 percent growth for the fourth quarter. The problem is, for the plaintiffs, and it's fatal to their case, there is nowhere alleged in the complaint about a fourth quarter forecast made by J&I before October 16, 2000. They don't say what the forecast Ms. Purdy was supposedly comfortable with. And they had ample opportunity to do that. And in fact the other statements discussed by opposing counsel regarding the purchasing manager, advising that component parts were not being purchased in order to make this number of product line, and also the fact that the sales team was not getting the purchases, and the fact that one of the biggest customers was not ordering. What's your response to that in terms of whether or not that's adequate to show that the statements were false and misleading? The problem is, those allegations, if you take them at face value in the complaint, don't show that any of the statements made by the company was false. And that's why this missing forecast is critical. Because they try to use those allegations to show that the company couldn't meet the forecast it gave to the market. But there is no allegation in the complaint that they gave a forecast to the market. So you're saying when they said we're comfortable with that, that there's no explanation of what that is? There is no specific allegation that says what that is. There is an allegation that refers to no analyst report, no statement by the company that at that time the analyst expectations were for 18 to 20 percent growth. But there is no allegation in the complaint that refers to a specific analyst forecast that is dated on or before October 16th for this company for the fourth quarter. And, in your honor, I submit there is a reason for that. Because if you look at what happened, eight days later there were some analyst reports and then they do come out with forecasts on October 24th. And, first of all, those forecasts aren't attributed to the company. But for the sake of this analysis, maybe they are. Those forecasts say on October 24th we are raising our expectations for the fourth quarter from $30.7 million in revenue to $34 million in change in revenue. So, as of October 24th, they're raising the forecast from $30.7 million to $34 million in change by implication from those analyst reports. As of October 16th, that analyst forecast was $30.7 million. Why is that important, your honors? Because what did J&I actually do in the fourth quarter of 2000? $30.7 million. You can't build a securities fraud case based on a disappointed forecast when you met the forecast that was in existence. There is conspicuously absent from this complaint is any analyst forecast that was dated before October 16, 2000. The best we can tell from the allegations in the complaint that the analyst forecast that Ms. Purdy said she was comfortable with was worth $30.7 million, and that's the number the company actually achieved. And that's why the missing forecast in this complaint is critical. And it is critical because all of the challenge statements in the complaint deal with statements of historic fact. They challenge the company's earnings release for the second quarter. They challenge the company's earnings announcements for the third quarter. In both press releases, all the company did was talk about historic information. They talked about the sales for the second quarter of 2000. They talked about the sales for the third quarter of 2000, and none of those numbers are challenged. Not once in this complaint do they say that the company's historic information reported to the market was false. So they have to manufacture this nonexistent forecast to build their case because this court, going well beyond Brody to convergent. What they say about feeling comfortable with analyst expectations, they then say that the analyst expectations based on prior statements by defendants were for 18 to 20 percent growth in Q400. Exactly, Your Honor. But that allegation does not meet the particularity requirements of Rule 9B or the Private Securities Litigation Reform Act. If those were the analyst forecast, where are they? When did the analyst make the forecast? Which analyst made the forecast? When was it published? And this is not the type of information the plaintiffs didn't have access to. I suppose that they said based on prior statements by defendant Smith on January 15th, here's what the company meant when they said we're comfortable with expectations. They've had at least three opportunities to plead that, and they didn't. There is not a single analyst forecast that is dated before October 24th, 2000 that identifies what the analyst forecasts were. As I explained, Your Honor, if you look at what the analyst did on October 24th, which was raise their forecast, by implication the forecast that existed was not this 18 to 20 percent growth forecast that is generally alleged in the complaint with no particularity. It was a forecast of $30.7 million, which is the number the company achieved during the fourth quarter. What was the 34 million number as a percentage? It was around 17, 16, 17 percent. All right, so it would be consistent with the 18 to 20 or close to it? It would be consistent, but this is what happened. This is what the analyst said eight days later. The market could not have understood Ms. Purdy's comments on October 16th that she was comfortable with a forecast made eight days later. And the only forecast that's been pointed to in the record as of the 16th of October was a 30.7, which would have been a smaller percentage growth. That's the number they hit. Was the failure to identify the specific forecast, and forgive me for not remembering this, identified by Judge Jones in the dismissal orders? It's specifically discussed in the order dismissing the Second Amendment complaint. In other words, he says if you've got it, then you've got to put it in your Third Amendment complaint. Right, and they didn't. They couldn't because it would destroy the whole theory of the case. She was comfortable with the number they met. That is not securities fraud. And then going back to what they allege was false. It was purely historic information where this court, from Convergent to Verifone all the way to the Brody decision, says when you have provided the market historic information, there is no implication, no implicit warranty that history will repeat itself. There's also no duty to give forecasts or other information to the market. The information that the plaintiff alleges that was withheld from the market does not change or render false the fact that J&I hit certain revenue numbers in the second quarter or the third quarter. There is that disconnect, and that's why Brody is important to this case. With respect to another issue that is raised in the appellant's reply brief that I want to address briefly, and you heard reference this morning to the fact that they claim they have lots of e-mails. In our brief, as we showed the court below, what they have given the court is carefully excerpted portions of the e-mails that change the meaning of exactly what was going on at that point in time. And in their reply brief, they said they cried foul that we improperly did that because the district court denied our request for judicial notice, which is true. But what the plaintiffs and appellants failed to inform this court is why the court below denied a request for judicial notice. In footnote two of the order dismissing the Third Amendment complaint, the court said, I'm denying the request because it's moot. Under branch versus tunnel, I can consider all documents referred to, relied upon, as incorporated by reference in the complaint. And the court below did actually go on and consider that material. And in footnote four in the associated text went on to explain how these e-mails, which the plaintiffs attempt to rely on, actually say something very different about what was going on with the company. So did the court consider the extra verbiage that was in the e-mails that you sought to have noticed? So that's not part of the district court record. It is, Your Honor. If you look at the order dismissing the Third Amendment complaint, there's a perfect example in footnote four in the associated text. The court is considering the entirety of a report that the plaintiff relies on in the complaint and said, I can do this under this court's decision in Perino. Can you talk about explicitly the e-mails, the entire text of the e-mail that you sought to have considered by the court? Was that made part of the court record, district court record? We submit that it was, if you read footnote two. By reference to footnote four, you're saying that by implication it was considered part of the district court record. Is that what you're saying? Footnote four expressly shows the court considered that material. The e-mail material? That one reference dealt with a specific report. In footnote two, the court said, I am considering all the material under Perino, which cites Branch v. Tunnel under this incorporation doctrine, except as to the material the plaintiff objected to. The material that the plaintiff objected to is not part of the argument that we're making here. I just wanted to clear that up from the reply. That's in the order of dismissing a complaint without leave to amend. That's in footnote two. Moreover, let me just briefly address the Dura issue here. If you look at what happened in this case, where the corrective disclosures, there were two. The first corrective disclosure was the first forecast that the company gave to the market on the fourth quarter, which occurred on December 11th. It only dealt with the fact that the company's forecast was for basically flat revenue growth in that fourth quarter. The second corrective disclosure is another forecast that the company gave to the market on March 28, 2011. For what expected to achieve in the first quarter of 2001. None of the footnote two, the court said, defendants have filed a request asking the court to take additional notes of the documents referenced in the complaint. The court may consider documents relied upon in but not attached to the complaint. There's nothing surprising about that ruling. But how does that relate to, if the plaintiffs put in a certain portion of an email and you want to put in additional portions of the email that were not referenced in the complaint or attached by the plaintiffs, how does this footnote help you? Because if you turn the page, Your Honor, it goes on and says the plaintiffs object to the court's consideration of exhibit A and portions of exhibit H, which are not part of our brief here in our argument. However, the court need not resolve the dispute because it did not rely on the objective portions of the exhibit. So by implication, the court did and take into consideration the portions of the material that was not objected to. And then if you go to footnote four, it shows where the court specifically did that with respect to a specific document. Your Honor, if I can turn to the totality of the complaint issue. And that is, if you look at what this complaint is all about, that on April 2000, these J&I executives got together and have attempted to create a scheme for securities fraud because they knew the fourth quarter was going to have flat revenues. The revenues would plateau. And then you look at the conduct that is alleged in the complaint by these individuals. And that shows that at the end of October 2000, after the secondary offering, after the first month of the fourth quarter of 2000, that sales were running behind internal expectations. That Ms. Purdy, who they claimed is central to this alleged scheme, reacted with surprise. She said, I don't know if we're going to make the quarter. If I may have just a minute to conclude, Your Honor. That she reacted with surprise, closed the trading window. No stock sales occurred after that while the company stock is still climbing. This is not conduct of somebody who had known for at least six months that this was going to happen. If this was known by these individuals and was the object of the fraud, she wouldn't have written e-mails and asked people like Micah Renich, what do you think we're going to do in the fourth quarter so I can report it to the board? So the overall conduct and alleged in the complaint is inconsistent with their theory of fraud. So in conclusion, Your Honor, like many securities fraud cases, this case is built around omissions. But there is a twist to it. And the twist is that the plaintiffs have argued that you need to consider all these e-mails and internal reports and statements of witnesses, but they only put a portion of that in front of the court. And they don't want the court to consider those other materials. And they argued for five pages the court should only consider those carefully crafted excerpts. And it's just like the forecast that they banty about in the complaint but never allege. This case, Your Honor, is about omissions. But it's the plaintiff's omissions from the complaint that shows why the district court reached the proper conclusion that this case does not allege a valid securities fraud claim and it was properly dismissed with prejudice and without leave to amend. Your Honors, we have to talk about these e-mails immediately. We don't object to the court considering the full text of an e-mail that we excerpted in the complaint. We know the law on that. If there's a three-page e-mail and I only give you the first page, of course the court can look at the other two pages. We are talking about eight instances in the answering brief where the defendants referred to e-mails, other e-mails, that were not part of the court record. There's an October 30 e-mail from Scott Ruppel and there's an October 30 e-mail from Purdy in which they try to use those e-mails which are not part of the record, which the court referred to when the district court said those were part of Exhibit H that I'm not going to look at. Those are the e-mails that they want to use to discredit the testimony of both Mr. Ruppel and Mr. Ornish, Mike Ornish, the Vice President of Sales, because with those e-mails they think they can bring up a colorable dispute about maybe Mr. Ornish shouldn't have been so pessimistic in October when he said, I went to the executive team and told them we are not making those numbers. That's why we object to those e-mails. They are not part of the record. I invite the court to go through our, I'm sorry, to go through the answering brief, look for those two e-mails at 2 SER 316, 317, and you'll find they are not part of the record. Now, moving on to the forecast, this is not just a missed forecast case. This is not just a forecast to the analyst. If it were, well, then my job is a little tougher, because opposing counsel is correct when he says we do not point to any specific public forecast that existed in a newspaper or something on October 16th. But here's what we have. We've got the CFO telling the assembled analysts, we are comfortable with your numbers. I'm afraid we have to do a little inferring on that. I understand, but let me actually jump from that to a more fundamental point. And that is we're also, I think, losing the big picture. And that is there doesn't have to be a forecast out there floating around in the Wall Street Journal. She is speaking to the market right then when she says we are comfortable with your numbers. And yet internally, they just received these e-mails saying we're not selling product. If your numbers are bad, then what's wrong with that? If you don't have any numbers, weren't bad. This may have been the first time I heard this argument when opposing counsel stood up and said she's probably referring to a forecast of 30 million. And then they they amended that forecast on the 24th. Well, that can't be true, because Jane and I had just gone through sequent sequential quarterly growth. They had just finished a second quarter, 30 percent growth. They had just they were just finishing their third quarter, 25 percent growth. They were heading into this secondary offering. The market was expecting them to grow. If she would she have said to the analysts, the analysts, by the way, that work for the underwriters putting on the offering, we're comfortable with you saying we are having flat revenues to know what the numbers are. I'm sorry. Don't we have to know what the numbers are that she's comfortable with? Isn't that isn't that essential? The complaint pleads that those numbers are is the rise from the 30 to the 35 and 36. I know that I know the complaint pleads that. But what's the basis of that allegation? Who said who and Jane? I said that those were the numbers. And when did they say it? If you look at the October 24th analyst report, it's not created in a vacuum. That report specifically refers back to the 16th conference call and says Jane and I reported, et cetera, et cetera, et cetera. And goes on and talks about all the great things happening with this bus and PCI. And here are the numbers that that they are expected to make in the next quarter. There's one piece of evidence. We've got an analyst off in December of 2000 saying we were expecting 19 percent or 18 percent. I forget. All you've got is the one statement saying we're comfortable with your numbers. And some new numbers come out eight days later. And then some and then some people see you're under. You're begging the question. You're assuming that those are new numbers. And I'm saying, wouldn't those analysts have said those analysts whose job it is to dig out information? I'm not begging the question. You've got the pleading burden of saying here is the statement they made. And when they made it with great particularity, this statement was false and they knew it was false at the time that they made it. And so for us to say that you've met that burden, we have to know what numbers we're talking about. I mean, we can we can speculate, but but we don't know. I think it's less speculation and more. It's a very reasonable inference. And as I said, when I first stood up. I can't find the at the moment the part of the complaint that I read to your opposing counsel. But you said in the complaint that this was there were defendants statements that that reflected what they thought the analyst's views were. Can you please put more specifically what what statements you're referring to when you say that we're comfortable with this? The analyst's job is to put out the numbers of what's investors care what's going to happen in a company in the upcoming quarters. I mean, that's it's they look forward to what how the company is going to do tomorrow, not how it did yesterday. I think it's a fair inference that defendant Purdy was speaking about the analyst then existing forecasts for the for the upcoming quarter, which is based upon information that the company is giving to them. I mean, we don't know any more than you've planned. And one of the issues here is whether the complaint should have been dismissed without leave. Is there anything else you can plead factually on this point? And if not, if so, why didn't you do it when the judge directed you to? I believe that was probably all we had on the forecast. But as I said, when I stood up, this is also not just a forecast case. I don't want the court to forget that, for example, in the Oracle case, here are some of the statements that were found actionable. Oracle is saying robust demand for its database. There is sustained demand for its database product. Those were held to be actionable statements in the Oracle case. What forward looking statements or what statements that were not statements of historical fact were false in this case? What statements? What statements that were not statements of historical fact were false in this case? Well, of course, and we're not quibbling with the hard numbers that they said. You know, we just sold 30. We just had revenues of 30 million. That's that's not the false statement. The false statement is S-Bus demand is strong and growing. That statement is directly contradictory to the CEO's own letter to the other executives. We just shipped 36 percent less S-Bus this quarter. You know, if you'll allow me to keep on speaking, I will. But perhaps I should wrap up. No, no, you did a couple of. Yeah. OK. Statements, for example, as I said, S-Bus is strong and growing. Flanagan, in the very same prepared statement, sort of deflects attention from how S-Bus is doing and says, by the way, don't forget. We've got these PCI products that we're coming out with now. JNI is now able. That's I believe those that those are the exact words is now able not hopes to not someday. JNI is now able to support a whole the whole variety of servers out there. In other words, we don't just have to sell to Sun Microsystems anymore. We don't just have to hope that somebody another major manufacturer like Hitachi uses our product. We now have the product that all the OEMs want. But we know that was false. We know that EMC had just stopped testing this great new product. We know that Purdy had just emailed five days earlier to another executive. We're not selling PCI. Those two statements are irreconcilable. You know, at bottom, your honors, I think you really have to. We're really left with this, and that is taking the alleged facts that we've pleaded, not the alleged legal conclusions. I'm not going to go down into that morass, but taking the alleged facts we've pleaded, the November meeting about the phony Asian deal, all of these emails coming in. Vice President of Sales Ornish testifying in sworn testimony. That should go in front of a jury that he specifically told the executive team, we're not going to make the numbers that you're giving the street. Taking those facts as true, have we not pleaded a case for securities fraud? Thank you, your honors. Thank you, counsel. Thank you both very much. The case just arguably submitted. The next case for argument is.
judges: Reinhardt, Rawlinson, Fogel